IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Criminal Action No. **08-cr-117-JLK**

**UNITED STATES OF AMERICA,**

      Plaintiff,

v.

**1.**     **XIU YUN LI,**

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Kane, J.

Defendant Xiu Yun Li is charged with knowingly cultivating a controlled substance, marijuana, in an amount of 100 plants or more in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). On April 3, 2008, I granted Defendant's unopposed motion for an ends of justice continuance of the then-scheduled trial date and for an extension of time until April 21 to file pretrial motions (Doc. #18). Defendant filed several substantive motions on the April 21 deadline, as well as motions for an extension of time to file additional motions and for a status conference. I granted Defendant until May 21 to file any additional pretrial motions and set a status conference for May 1. (Doc. #21). At the May 1 status conference, I again extended the motions deadline, this time to June 2, 2008, and set a motions hearing for July 3. I also set a three-day jury trial to begin on September 29, 2008. (Doc. #30). Defendant filed one additional motion by the extended June 2 deadline.

1

Before and at the July 3 motions hearing I advised all counsel that my wife and I are represented in a state court matter by Hal Haddon, who is affiliated with the same firm as Defendant's counsel. I instructed counsel that either party could object to my presiding in this case without identifying which party or parties objected and I would recuse myself from this case. Neither side objected and I therefore will proceed.

This matter is now before me on the following pretrial motions, all of which were argued on July 3:

1. Defendant's Motion for Discovery (Doc. #20), filed April 21, 2008;

2. Defendant's Motion to Suppress Evidence Seized as a Result of the Warrantless Search of 7565 East 121st Place, Thornton, Colorado, and all Evidence Derived from the Warrantless Search (Doc. #22), filed April 21, 2008;

3. Defendant's Motion to Suppress Evidence Seized as a Result of the Stop, Search, and Seizure of Mr. Li and the Search of his Residence on February 21, 2008 (Doc. #21), filed April 21, 2008; and

4. Defendant's Motion to Suppress Intercepted Wire Communications (Doc. #31), filed June 2, 2008.

For the reasons stated below, I deny each motion with one exception. At the July 3 hearing, the government confessed the portion of Defendant's second motion to suppress (Doc. # 21) that addressed Defendant's statements through an interpreter following his stop on February 21, 2008. I therefore grant this portion of Defendant's motion only, and order these statements suppressed.

<u>Discussion</u>

I.      Defendant's Motion for Discovery (Doc. #20)

        In this motion, Defendant Xiu Yun Li requested that the government produce a number of items including: 1) the audio recording of a call from an alleged citizen informant and 2) the name, address and phone number of the caller. (Def.'s Mot. for Disc. 1.) On May 1, 2008 the government responded by agreeing to produce all of the items requested save for items 1 and 2. (Govt's Resp. to Def.'s Mot. for Disc. 1-2.) The government objected to providing these two items because the caller wished to remain anonymous, it did not intend to call the citizen informant as a witness at trial, and because it maintains nothing in the audio recording of the phone call or what the caller observed or reported could be interpreted as favorable to the defense. (Resp. 1-2.) It is also undisputed that the government has previously produced written discovery concerning the call, including a narrative summarizing the substance of the call. *See* Def.'s Mot. for Disc., Ex. 1 (CAD call information print out).

        As a general matter, Rule 16 of the Federal Rules of Criminal Procedure requires that the government disclose: the defendant's oral statement; defendant's written or recorded statement; defendant's prior record; documents and objects that are material to the preparation of the defense or that the government intends to use at trial; reports and examinations that are material to the preparation of the defense or that the government intends to use at trial; and a written summary of any expert testimony to be used at trial. Fed. R. Crim. P. 16(a)(1)(A)-(G). Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the government is also required to disclose any evidence favorable to the accused that is material to either guilt or punishment. In *Giglio v.*

*United States*, 405 U.S. 150 (1972), the Supreme Court further required the government to disclose any information that may be used to impeach its witnesses.  Fed. R. Crim. P. 26.2.

Because the government does not intend to call the reporting citizen at trial and the citizen does not have any information that would be exculpatory or could be favorable to the defendant, nothing in Rule 16 or in *Brady* or *Giglio* requires the government to identify this citizen or disclose the transcript of his or her telephone call.  *See* Fed. R. Crim. P. 16(a)(1)(A)-(G); *see also Brady*, 373 U.S. 83; *see also Giglio,* 405 U.S. 150.  I know of no other authority obligating the government to produce the disputed items.  Therefore, the government's objections to this discovery (items 1 and 2 of defendant's motion) is sustained.

The remainder of defendant's motion is denied as moot because the government has agreed to produce the other requested items.

II.     Defendant's Motion to Suppress Evidence Seized as a Result of the Warrantless Search of  7565 East 121st Place, Thornton, Colorado and All Evidence Derived from the Warrantless Search (Doc. #22)

Defendant Li argues that the warrantless search of 7565 East 121st Place violated the Fourth Amendment because it was not justified by the exigent circumstance of destruction of evidence, and therefore all the evidence obtained by the search of this property should be suppressed.

The facts indicate that the agents who entered 7565 East 121st Place without a warrant had probable cause and a reasonable belief that evidence was going to be destroyed at that location.  Whether a warrant could have been obtained in time to prevent this destruction is the crux of the motion.  The agents needed to decide whether they could have obtained a warrant quickly enough to secure the residence before the evidence present there was destroyed.

A.     Background

DEA Special Agent Michael Marshall and Intel Analyst Hoffman testified that on February 15, 2008, DEA Agents intercepted phone calls indicating that marijuana grow houses operated by a large drug conspiracy run by Dan Tang and Fa Sheng Huang were being dismantled.  One of these calls was from Haung to an unknown male, instructing the unknown male to dismantle a grow operation at 7565 East 121st Place in Thornton, Colorado, so that law enforcement officers would not find the operation and seize its crop.  Concerned that the wiretap and investigation were about to be compromised, SA Marshall gathered the agents involved in the case to plan a strategy for investigating and searching the houses.  Marshall directed DEA Agents to a series of locations, approximately 27 in all, around the North Denver Metro Area where suspected grow houses were being dismantled.  DEA Agents Todd Wheeler and Mike Tonozzi were at a nearby residence at 121st Drive in Thornton when they were directed to 7565 East 121st Place.  The agents did not have a warrant to search the house when they arrived at approximately 1:30 a.m. on the 16th.

As they approached the house, the agents smelled marijuana.  Agent Wheeler knocked on the front door, and Tonozzi saw someone come towards the door,  and then run towards the back of the house.  Agent Tonozzi testified that he and Agent Wheeler entered the house and discovered three individuals in the basement, whom they placed in handcuffs.  Other agents arrived on the scene, one of whom obtained consent from one of the individuals in the basement, an unidentified female, to search the house.  The agents then seized 186 marijuana plants, 53 sodium grow lights and 55 light ballasts.  The marijuana plants had already been uprooted from their growing pots and placed in large plastic bags.  A van was parked in the garage.  Records of

the Tax Assessor of Adams County Colorado show that the defendant Xiu Yun Li owned the house. Agent Tonozzi testified that earlier on the same night he obtained a search warrant for another residence, but by the time the warrant could be executed, the marijuana growing operation had been dismantled and only growing lights and ballasts remained. The government claims the agent's entry into the house at 7565 East 121st Place without a warrant was justified because of exigent circumstances, namely the imminent destruction of evidence. (Gov't's Resp. to Mot. to Suppress 2.)

B.      Legal Standard

Absent consent or exigent circumstances, warrantless searches and seizures inside a home are not permitted. *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996). Fear that destruction of evidence is imminent can, in appropriate cases, constitute exigent circumstances that permit a warrantless search. *See id.* When police conduct a search of a residence without first obtaining a warrant, the government bears the burden of proving that sufficient exigent circumstances exist. *Id.*

Under Tenth Circuit authority, a permissible warrantless entry into a home to prevent the destruction of evidence must meet four requirements. *Scroger*, 98 F.3d at 1259. The entry must be: "(1) pursuant to clear evidence of probable cause;[1] (2) available only for serious crimes and in circumstances where the destruction of evidence is likely; (3) limited in scope to the minimum intrusion necessary; and (4) supported by clearly defined indicators of exigency that are not

---

[1]      "Probable cause exists where the facts and the circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979) (internal quotation omitted).

subject to police manipulation or abuse." *Id.* (quoting *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988)). In assessing whether the government has carried its burden of proving these requirements, the court must evaluate the circumstances as they would have appeared to prudent, cautious and trained officers. *Id.* (quoting *United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir. 1993)). The court's determination will ultimately depend on the unique facts of the case. *See Scroger*, 98 F.3d at 1259.

In *Scroger*, the Tenth Circuit held that the warrantless entry into defendant's home was justified by exigency after the defendant answered the door holding methamphetamine-manufacturing equipment and officers smelled manufacturing chemicals coming from the house. *Scroger*, 98 F.3d at 1257, 1259. Officers approached the home to investigate reports of drug activity, heard commotion inside and someone say, "go out back," *Id.* When they knocked on the front door, the defendant answered holding a hot plate and with rust-colored residue on his fingers. *Id.* Officers smelled a "strong odor" coming from the residence that they recognized as methamphetamine manufacture, and saw glassware used for manufacture inside the house. *Id.* After the officers identified themselves, the defendant attempted to push one of the officers out of the doorway. *Id.* The officers took the defendant into custody and entered the house to perform a protective sweep. *Id.* The court found that the warrantless entry was justified because officers had probable cause to enter the house based on the hot plate, the stained fingers, and the odor; evidence was highly likely to be "destroyed or moved if the officers had waited to…obtain[] a warrant"; the warrantless entry and sweep were "limited in scope to ensure the safety of the officers and the residence," as officers did not conduct a full search until after a warrant was obtained. *Id.* at 1260-61. Finally, the court found that the district court did not

abuse its discretion in finding that officers did not "manipulate or abuse the circumstances" of the case, because one of the investigating officers testified to having insufficient evidence for a search warrant before arriving at the house. *Id.* at 1260.

In assessing the second prong of the four-part test, the Tenth Circuit has also "stressed that an important consideration is the time necessary to procure a warrant," and whether officers could have obtained a warrant quickly enough to prevent the destruction of evidence. *United States v. Aquino*, 836 F.2d at 1273. In *Aquino*, the court found exigent circumstances justified the warrantless entry into and protective sweep of the defendant's apartment after a partially completed cocaine buy involving an undercover agent, a dealer, a middle-man and the defendant, the suspected source. *Id.* After the sweep, officers obtained consent to search the apartment. *Id.* The court found there was probable cause for the search because the middle-man traveled directly to the apartment twice during the transaction, and "the facts and the circumstances within their … knowledge and of which they had reasonably trustworthy information [were] sufficient in themselves to warrant a man of reasonable caution in the belief that" the defendant's apartment contained drugs. *Id.* (quoting *Dunaway*, 442 U.S. at 208 n. 9). The court also found there was sufficient evidence indicating that the cocaine source "was growing suspicious," and might destroy evidence before the officers could get a warrant, which they estimated would take about three hours. *Id.* Despite affirming the denial of defendant's motion to suppress and finding exigent circumstances, the court noted it was "distressed by the lack of evidence in the record that the police ever began the process of procuring a warrant even though a local magistrate was on duty at the time." *Id.*

C.      Analysis

Mr. Li argues that there were no exigent circumstances justifying a warrantless search of 7565 East 121st Place because officers could have obtained a warrant before visiting the residence and that their observation of a man running from the door was not enough to create exigent circumstances.  (Def.'s Mot. to Suppress 3.)  The government responds that the officers' warrantless entry was made upon probable cause and with the belief in the imminent destruction of evidence.  (Govt's Resp. to Mot. 3.)

As described below, I find the facts presented establish that all four prongs of *Scroger*'s four-part test for warrantless entries based on the imminent destruction of evidence are satisfied.

1.      Clear evidence of probable cause

The first requirement of the *Scroger* test is satisfied here.  The officers had probable cause to search the house as soon as they intercepted the cell phone call from Huang, as they had reasonably trustworthy information sufficient in itself to form a reasonable belief that the house was being used as a marijuana grow operation.  *See Aquino*, 836 F.2d at 1273.  If the intercepted phone call was not sufficient to establish probable cause, then the officers' report that they smelled marijuana as soon as they approached the house, coupled with the intercepted phone call, establishes probable cause.

2.      Serious crime and circumstances where destruction of evidence is likely

As to the second prong, cultivating marijuana is a "serious crime" comparable to the methamphetamine manufacture considered in *Scroger*.  *See Scroger*, 98 F.3d at 1260.  Based on Agent Tonozzi's nearly contemporaneous experience at another residence, the destruction of the grow operation, or of some subset of evidence present in the house, was likely to occur before

the agents could get a warrant. *See id.* at 1260. Although defendant argues that the officers' observation of someone running from the door of the house is inadequate to establish exigency, this observation coupled with the agents' knowledge that Huang had ordered the grow house dismantled was sufficient to support a determination that evidence would be destroyed. *See Scroger*, 98 F.3d at 1259. The fact that the marijuana plants were already uprooted and placed in large trash bags makes it clear that the evidence was going to be destroyed before the officers could obtain a warrant. *See id.* The evidence also shows that a total of 27 grow houses scattered in the North Metro area were subject to the same dismantling directions from Fa Sheng Huang. An estimate of how long it might have taken to get warrants for all the grow houses increases the exigency of the circumstances. Moreover, before the raids on the 27 grow houses it was prudent and necessary for Agent Marshall to collect the required number of agents and instruct them and to clear his strategy with superiors who were present at the strategy meeting and gave their advice.

3.     Warrantless search limited to minimum intrusion necessary

The facts demonstrate that the search was "limited in scope to the minimum intrusion necessary," to ensure evidence was not destroyed and to secure the safety of the officers. *See Scroger*, 98 F.3d at 1259. A sweep of the house without a warrant, *see Scroger* at 1260, was necessary and reasonable. Consent to search the house was obtained from the female who was present, but no evidence suggests she had authority to give it. *See Aquino* 836 F.2d at 1273. None, however was necessary. This search was "limited in scope," so as only to secure the house and ensure evidence was not destroyed. The third requirement is satisfied. *See id.*

4. Clearly defined indicators of exigency not subject to police manipulation or abuse

Finally, the fourth requirement of the *Scroger* test is also satisfied. The agents' entry was supported by clear indicators of exigency as the calls intercepted on the wiretap indicated that the marijuana cultivation operations at several locations were going to be destroyed and Agent Tonozzi witnessed the destruction of evidence at another location. *See Scroger*, 98 F.3d at 1260. Wheeler and Tonozzi approached a location known to be in the process of dismantling, observed an individual inside, and entered. No evidence suggests that the agents manipulated or abused the circumstances of the case. *See id.*

Testimony from Agent Marshall, Agent Tonozzi, and Intel Analyst Hoffer shows that the officers had probable cause to search the house; that the grow lab was in the process of being dismantled; and finally that their search of the residence was the minimal intrusion required to preserve the evidence. The motion is denied.

III. Motion to Suppress Evidence Seized as a Result of the Stop, Search and Seizure of Mr. Li and the Search of his Residence on February 21, 2008 (Doc. #21)

Defendant Li moves to suppress all the evidence seized as a result of his traffic stop and subsequent seizures on February 21, 2008 on several grounds. Broomfield Officers stopped Mr. Li, searched his van, detained him, advised him of his Miranda rights which he allegedly waived, took his statement and obtained his consent to search his home. Mr. Li argues that all of these seizures were tainted by an earlier illegal search, and that the stop, detention, *Miranda* waiver and consent were also illegal on independent grounds.

A.     Background

On February 21, 2008, the Broomfield Police Department received a call from a citizen reporting a brown substance seeping from the siding on the back of a house located at 13620 Plaster Circle in Broomfield, Colorado. Officer Meredith Durham arrived at the residence and knocked on the door but no one responded. She reported a strong odor of growing marijuana coming from the residence. Detective Oser conducted a records check and discovered Xiu Yun Li, a name he "recognized," owned the home.

Officers established surveillance at the residence and observed a Honda Odyssey van arrive at approximately 10:15 a.m. on February 21st and drive into the garage. A license check determined that the vehicle belong to Mr. Li. When the van left the residence, Officer Durham followed for some blocks and eventually pulled the vehicle over. Officer Durham testified that the stop was based on an obstructed view of the front windshield and the slow speed of the van. Officer Durham approached the vehicle and directed the defendant to lower the left front side window, whereupon she immediately smelled the strong odor of marijuana. Officer Durham testified that Mr. Li was able to respond to instructions in English. Mr. Li testified, in Cantonese, that while he does not speak English, he was able to follow Officer Durham's directions because of her hand gestures and an understanding of some English words, such as "Driver's License."

After Office Durham obtained Mr. Li's identification, Detective Oser arrived on the scene and observed marijuana plants sticking out of plastic bags in the back of the van. The officers conducted a search of the van and seized 971 marijuana plants from inside eleven plastic bags in the rear of the vehicle.

The officers then called interpreter David Yeung to read Mr. Li his *Miranda* rights. Mr. Yeung read Mr. Li his rights in Mandarin Chinese. The defendant did not deny understanding Mandarin, but said his "preferred" language is Cantonese. No evidence was offered as to the difference between these languages, whether they are related or share cognates or whether Mr. Li could understand Mandarin. Officer Durham testified that Mr. Li and Mr. Yeung appeared to be conversing and understanding each other, however she did not understand the language they were speaking.

Mr. Li allegedly waived his rights and told officers he owned the house at 13620 Plaster Circle, but that the marijuana was not his and that an unidentified individual paid him $1,000 to remove the marijuana. After this conversation Mr. Li signed a written consent to the search of his residence, cell phone and person. Officers entered the residence and secured it while Honorable Judge Brockmon of the Broomfield County Court issued a warrant to search the house. After searching the house, the officers discovered a dismantled marijuana grow operation in the house and seized sixty-five grow lights and sixty-five ballasts, devices used to operate the lights. They also discovered the house had a bypassed utility meter allegedly used to steal electricity and conceal the operation.

Li asserts that all evidence seized by Broomfield Police on February 21, 2008 should be suppressed on multiple grounds. First, he asserts this evidence should be suppressed as the fruits of the allegedly illegal search of another property, 7565 121st Place, Thornton, on February 17, 2008. (Def.'s Mot. to Suppress 2-4.) Independent of this alleged taint, Li also asserts that the traffic stop of his van and the detention of his person were not supported by probable cause because he was not violating any traffic laws at the time of the stop. (Def.'s Mot. 4-5.) Mr. Li

further asserts that his consent to speak to the police was involuntary both because it was tainted by the illegal traffic stop, and because he was advised of his *Miranda* rights in "a language that is not his language of choice by someone whose qualifications are unknown."  (Def.'s Mot. 6.)  Finally, Mr. Li challenges the validity of his signed consent to search his house at 13620 Plaster Circle, arguing that this consent was not the product of a knowing and intelligent waiver.  (Def.'s Mot. 6.)  The Government confessed for the purposes of this motions hearing the statements made by Mr. Li to the interpreter.  The interpreter is in California and pursuant to doctor's orders could not travel to Colorado for the hearing.

  B.  Analysis

    1.  Taint from Prior Unlawful Search

  In order to prevail on his argument that the search of 7565 121st Place on February 17, 2008 tainted the stop and search of Mr. Li's van, his interrogation and the search of 13620 Plaster Circle, the defendant must demonstrate that:  (1) the search of 7565 121st Place was in fact illegal; and (2) that there is a factual nexus between this earlier search and the stop of Mr. Li's van on February 21, 2008 and the searches that followed.  I have ruled in Part II of this Memorandum that the search of 7565 121st Place, Thornton, Colo. was legal and therefore no taint exists.  However, the issue of taint can be decided without reference to this separate issue because, even assuming that the search of 7565 121st Place was illegal, Mr. Li cannot establish a factual nexus between this earlier search and the February 21 stop and an independent basis for the stop exists on the basis of Officer Durham's testimony.

  The remedy for a search that violates the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct and any evidence deemed to be "fruit of the

poisonous tree," evidence that is discovered as a direct or indirect result of the conduct. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). To show that evidence is a result of illegal activity, "a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). Evidence that is the result of an illegal search may nonetheless be admitted if it: "(1) has but an attenuated link to the underlying illegality; (2) derived from a source independent of the illegal conduct, or (3) would have been inevitably discovered absent the illegality." *United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995) (internal citations omitted).

In *Nava-Ramirez*, the court held that the defendant could not show a factual nexus between his illegal detention and the search of his companion's vehicle to allow suppression of the evidence resulting from the search. *Id*. An officer legally stopped Nava-Ramirez and his friend, observed evidence of methamphetamine use, performed a consent pat-down search of both individuals, and found two pipes in the friend's pocket. *Id*. at 1130. The officer then searched the passenger compartment of the car and found nothing. *Id*. He next searched the trunk and found methamphetamine. *Id*. The defendant argued that when the officer found nothing in the passenger compartment his continued detention became illegal and the subsequent search of the trunk was the fruit of his illegal detention. *Id*. at 1131. The court rejected this argument because the defendant could not show that the detention, even if illegal, was a "but for cause" of the seizure. *Id*. There was no evidence that the officer would have let the defendant leave in his friend's car such that the officer would not have searched the trunk and found the drugs. *Id*. The court held the evidence found in the trunk was therefore properly admitted. *Id*.

Mr. Li argues that the prior illegal search of 7565 East 121st Place poisoned the traffic stop, interrogation and searches of Mr. Li's car and home on February 21st. Li claims the government "would not have known of Mr. Li, suspected Mr. Li, conducted surveillance of Mr. Li or stopped, searched and interrogated Mr. Li absent the prior illegal search." (Def.'s Mot. 4.) Li also argues that none of the three exceptions to the exclusionary rule apply. (Def.'s Mot. 3.) The government responds by arguing that the stop of Mr. Li was justified based on reasonable suspicion of Mr. Li and was unrelated to the search of 7565 East 121st Place. (Govt. Resp. 3.)

The legality of the search of 7565 121st Place was determined, but even assuming, *arguendo*, it was illegal, the defense failed to establish any factual nexus between this search and the traffic stop of Mr. Li or the subsequent searches of his car and residence. *See id*. To make this argument, the defense had to show that the search of 7565 121st Place was a but for cause of the later traffic stop and searches. *See id*. Given that the officers had reasonable suspicion to stop Mr. Li independent of the search of 7565 121st Place, this earlier search cannot be a but for cause of the later searches. *See id*. The officers had other reasons to stop Mr. Li, as discussed below, and these reasons were unrelated to any alleged unconstitutional conduct. *See Wong Sun*, 371 U.S. at 485. Therefore a discussion of the exceptions to the exclusionary rule is not necessary because the evidence obtained on February 21st was not the result of the earlier search. *See Griffin*, 48 F.3d at 1150.

2.      Reasonable Suspicion for the Car Stop

Officers may make an investigatory traffic stop without a warrant under the doctrine of reasonable suspicion provided by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001). The first prong of the *Terry* analysis

considers whether the stop was justified at its inception, and the second prong considers whether the officer's actions were reasonably related in scope to the circumstances that initially justified the stop. *Terry*, 392 U.S. at 20. Reasonable suspicion requires that an officer base the stop on a reasonable, articulable suspicion of criminal activity. *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002). In determining whether officers had reasonable suspicion to justify the search, courts look at the totality of the circumstances to determine whether a trained officer would have had a reasonable belief that criminal activity was likely occurring. *United States v. Arvizu*, 534 U.S. 266 at 273-74 (2002).

In *Arvizu*, the Supreme Court held that an officer's cumulative observations of a minivan driving in a rural area amounted to a reasonable suspicion that the van was engaged in smuggling contraband and justified an investigatory stop of the vehicle. *Id.* at 271, 273-74. Although individual observations, such as children in the van waiving unnaturally as if being directed, were susceptible to innocent explanations, the Court held that it was reasonable for the officer "to infer from his observations," which indicated the car was behaving suspiciously and evading a checkpoint, "his registration check," which indicated the minivan was registered in an area notorious for smugglers, "and his experience as a border patrol agent," that the minivan was likely to be smuggling contraband. *Id.* at 276-77. The Court explained that although the likelihood of criminal activity must amount to more than an officer's "mere 'hunch,'" it "need not rise to the level required for probable cause," and can fall "considerably short of…preponderance of the evidence." *Id.* at 274 (citing *Terry*, 392 U.S. at 27; *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Further, the Court noted that although the test for reasonable suspicion is "somewhat abstract," it cannot be reduced to a bright-line rule. *Id.* Finally, the

Court dismissed the defendant's argument that the facts "suggested a family in a minivan on a holiday outing," because "a determination that reasonable suspicion exists…need not rule out the possibility of innocent conduct," and this alternate explanation did not preclude the Court's holding that the search was justified by reasonable suspicion. *Id*. at 277.

Mr. Li argues that the stop of his Honda Odyssey van was not supported by probable cause. Li claims Officer Durham pulled him over based on a falsified traffic violation that was only a pretext to investigate the marijuana growing operation. (Def.'s Mot. 4-5.) The government responds by asserting that Officer Durham stopped Mr. Li's Honda Odyssey van on February 21st because the vehicle had driven out of the garage of 13620 Plaster Circle, a house the officers suspected to be a marijuana grow house. (Govt.'s Resp. 3.) A citizen had called in that day to report that the house had a brown liquid oozing from its siding, and Officer Durham herself had observed that the house was emanating "a strong odor of growing marijuana." (Govt.'s Resp. 1.) After the van left the house, Officer Durham observed it drive at a suspiciously slow speed and watched the driver look back at her nervously. The government therefore asserts that the stop was supported by reasonable suspicion.

Officer Durham had reasonable suspicion, based on her training and experience with marijuana grow houses, to conclude that 13620 Plaster Circle house was a grow house and that a van leaving its garage might contain evidence associated with a marijuana grow operation. *See Arvizu*, 534 U.S. 266 at 277. The slow speed and behavior of the driver compounded this suspicion. This suspicion justified an investigatory stop of the vehicle. *See id*. The search of the vehicle and detention of Mr. Li that followed were based on the officers' observation of items in the vehicle, as explained below, and is separate from this analysis. The availability of

innocent explanations of the facts, such as the van visiting the house for unrelated reasons, does not preclude this finding. *See id.* However, the doctrine of reasonable suspicion is somewhat malleable, as noted by the Court in *Arvizu*, and this question is essentially a judgment call for the court after hearing the testimony at the evidentiary hearing. *See id.* I heard the testimony and find Officer Durham's testimony to be credible and persuasive.

        3.      Probable Cause for the Search of Mr. Li's Van and the Detention of Mr. Li

The officers' subsequent search of the van was justified under the automobile exception to the Fourth Amendment's warrant requirement. The officers were also justified in arresting Mr. Li without a warrant because they had probable cause to believe he was committing a crime.

The automobile exception allows an officer who has "probable cause to believe there is contraband inside an automobile that has been stopped on the road" to "search it without obtaining a warrant." *United States v. Lyons*, 510 F.3d 1225, 1241 (10th Cir. 2007) (citing *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002)). An officer has probable cause to search a vehicle if "under the totality of the circumstances there is a fair probability that the car contains contraband or evidence," *Id.* (quoting *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004)). In *Lyons* the court held an officer had probable cause to cut open a car's spare tire because the tire was hanging lower than normal, the tire was clean but its rim had fingerprints and tool marks, the tire was larger and of a different brand than the four tires on the car, an "echo test" indicated there might be contraband hidden in it and the tire was extraordinarily heavy. *Id.* All these observations together demonstrated a "fair probability that the spare tire contained contraband," and justified the warrantless search of the tire. *Id.*

A warrantless arrest is justified under the Fourth Amendment where officers have probable cause to believe a person has committed a crime because "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Jones v. City and County of Denver, Colo.*, 854 F.2d 1206, 1210 (10th Cir. 1988). In *Jones*, the court held that the government had probable cause to support a number of warrantless arrests in the investigation of a suspected bank fraud scheme. *Id.* One of the arrests occurred subsequent to the execution of a search warrant at the defendant's place of business, where officers found the defendant, whom a confidential informant had indicated was forging checks, along with implements of forgery. *Id.* The court held that the discovery of the defendant with the implements at the same location would lead a reasonable officer to conclude that probable cause existed for the defendant's arrest. *Id.* at 1209-10.

Mr. Li does not challenge the search of his van specifically, but he does assert that there was no probable cause for his detention after the traffic stop. (Def.'s Mot. 4.) The government responds that the arrest of Mr. Li was supported by probable cause because "almost immediately" upon the stop of Mr. Li's van, Officer Oser saw a marijuana plant sticking out of a bag in the back of the van. (Govt.'s Resp. 3.) This led the officers to search the van, which revealed 971 marijuana plants and provided probable cause for the arrest of Mr. Li. More to the point, Officer Durham first directed Mr. Li to lower the side window and immediately smelled the strong odor of marijuana.

The pungent smell of marijuana emanating from a car constitutes probable cause to believe a car contains marijuana. Moreover, visual sight of a marijuana plant is evidence that the

car contains contraband, thereby providing probable cause to search the vehicle.  *See Lyons*, 510

F.3d at 1241.   After discovering 971 marijuana plants, Oser also had probable cause to believe

that Mr. Li was in possession of contraband and therefore lawfully arrested Mr. Li.  *See Jones*,

854 F.2d at 1210.

4.      Validity of *Miranda* Waiver

The government bears the burden of proving by a preponderance of evidence that a

defendant who has chosen to speak to the police has voluntarily waived his 5th Amendment right

to remain silent.  *United States v. Toro-Peleaz*, 107 F.3d 819, 825 (10th Cir. 1997) (citing

*Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).  The government must show: "(1) that the

waiver was the product of free and deliberate choice rather than intimidation, coercion or

deception; and (2) that the waiver was made in full awareness of the nature of the right being

waived and the consequences of waiving."  *Id*. (citing *Moran v. Burbine*, 475 U.S. 412, 421

(1986)).  The waiver must be examined in the context of "the totality of the circumstances

surrounding the interrogation," and the court must take into account "the characteristics of the

defendant, the circumstances surrounding the statements, and the tactics employed by the

police."  *Id*. (citing *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996); *United

States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993)).

In *Toro-Peleaz*, the court considered the Miranda waiver of a defendant pulled over on

the highway.  *Id*. at 823.  Although the defendant was a Colombian national, he lived and worked

in the United States for some time, spoke to the Highway Patrol in English and gave no sign to

the troopers that he "was unable to comprehend the English language or the rights of which he

was advised."  *Id*. at 826.  The court concluded that there was no indication that the defendant

21

was improperly advised of his *Miranda* rights, nor that he was "punished []or subjected to prolonged or intimidating questioning," such that the totality of the circumstances demonstrated that he "freely and deliberately waived his right to remain silent[.]" *Id*.

Mr. Li argues that his waiver of his right to remain silent was not voluntary because his stop was illegal, as discussed above, and because he was advised of his rights in Mandarin Chinese, not his language of choice. (Def.'s Mot. 5-6.) Although Mr. Li does not argue that he was coerced in any way, he claims, though not explicitly, that the second prong of the test for voluntariness fails because Mr. Li was not aware of the rights he was waiving.

Even if Mr. Li was advised in Mandarin, and Mandarin is not his language of choice, Mr. Li provides no evidence that he is not able to understand Mandarin generally. (Def.'s Mot. to Suppress 6.) Without such evidence, there is no reason to suspect that Mr. Li's waiver was involuntary or otherwise coerced. *See id.* However, because the burden is on the government to demonstrate that the waiver was voluntary (though only by a preponderance of the evidence), the testimony of the interpreter, Mr. Yeung, was needed to assess the relevant facts, which may include what language Mr. Li spoke to the officers, what language he was advised in, what Mr. Li's capacity is with that language and whether Mr. Li generally behaved as though he in fact understood the advisement of his rights. *See id*. at 825-826. This evidence was not available and the Government commendably confessed the motion as it pertained to the statements made by Mr. Li through the interpreter.

### 5. Validity of Consent to Search Mr. Li's Residence

Like the waiver of *Miranda* rights, the voluntariness of consent to search is determined by the totality of the circumstances, and the government bears the burden of proof on the issue.

*United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) (citing *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001)).  To meet this burden the government must "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely given and (2) prove that this consent was given without implied or express duress or coercion." *Id*.  In *Lyons*, the videotape of a consent search showed an officer using a "pleasant, not intimidating" tone twice ask the defendant for permission to "look in the back," of his car.  *Id*.  Although the defendant's response to the first request was inaudible, he responded to the second inquiry by stating "go ahead" and unlocking the back door.  *Id*.  The court concluded there was no evidence of coercion or threat, and that the consent was therefore voluntary.  *Id*.

Mr. Li argues that his consent to the search of his house at 13620 Plaster Circle was involuntary both because it was tainted by the allegedly illegal search, discussed above, and because the waiver form he signed is inadequate on its face.  (Def.'s Mot. to Suppress 6.)  The form was inadequate, he asserts, because it "misrepresents what the government may do with any recovered evidence," by stating: "I [the defendant] know that if deputies find anything during the search that they believe is evidence of a crime or evidence which would later be used in a criminal prosecution, they will take/seize it."  (Def.'s Mot. to Suppress 6.)  Defendant argues this waiver does not specifically state that the items will be used *against the defendant* in a resulting prosecution.  The government responds only by stating that Mr. Li "gave his consent both orally and in written form" to the search of his residence.  (Govt.'s Resp. 3.)  Mr. Li also testified that he did not understand the English form, nor the interpreter Mr. Yeung's explanation of it in Mandarin, and that he therefore did not know what he was signing.

Nothing in the standard as stated in *Lyons* suggests that an officer must explicitly state that material recovered from a search will be used against the defendant in so many words. *See Lyons*, 510 F.3d at 1239. Rather, the standard only requires testimony demonstrating that consent was specific, given freely and without coercion. *Id.* The waiver signed by Mr. Li is specific in naming the areas to be searched, it is unequivocal in its explanation that these areas will be searched, that items may be seized from these areas, and that these items may be used in criminal prosecutions. *See id.* Nothing in the facts indicate that Mr. Li was intimidated or coerced in any way. *See id.* However, without the testimony of the interpreter Mr. Yeung to contradict Mr. Li's testimony that he did not understand what the form said, the government cannot meet its burden of proof to show that Mr. Li knowingly and freely consented to the search, and the consent is not valid. *See id.*

> 6.   Validity of Seizure from House Absent Consent

Despite the government's failure to demonstrate that Mr. Li's consent to search 13620 Plaster Circle was voluntary, the evidence seized from this residence need not be suppressed because the officers seized the evidence pursuant to a valid search warrant.

The Tenth Circuit has held, interpreting the Supreme Court in *Segura v. United States*, 468 U.S. 796 (1984), that "where an independent source is present for a search warrant under which evidence is seized, the legality or illegality of an initial warrantless entry has no bearing on the admissibility of the evidence." *United States v. Corral-Corral*, 899 F.2d 927, 930 (10th Cir. 1990). In *Corral-Corral*, Officers made an initial warrantless entry into the defendant's home and seven hours later received a search warrant to search the home. *Id.* at 929. The search revealed marijuana, cocaine and several firearms. *Id.* at 930. The court found that the "issuance

24

of the search warrant and discovery" of the contraband were "wholly unrelated to the initial warrantless entry," and further that the warrant's issuance was not based on any information gained as a result of the initial entry. *Id.* The court therefore held that because the evidence was the product of the search warrant and not the initial entry, "the legality of the warrantless entry [was] not at issue." *Id.*

The evidence seized from 13620 Plaster Circle was the product of a search warrant, whose validity is unchallenged by Mr. Li, and not the product of the officers' initial entry into the house pursuant to an invalid consent. *See id.* Although officers entered 13620 Plaster Circle pursuant to Mr. Li's consent, they waited until a search warrant was issued to search the residence. This search produced sixty-five grow lights and sixty-five light ballasts. Although Detective Oser's Application and Affidavit for Search Warrant for 13620 Plaster Circle mentions Mr. Li's statement to police that he was dismantling a grow operation at this address, and that Mr. Li consented to the search, the affidavit also describes the discovery of marijuana plants in Mr. Li's van, a vehicle that was observed leaving the residence moments prior. (Govt.'s Ex. 7.) This information was wholly unrelated to Mr. Li's statements and was sufficient in itself to support a finding of probable cause to issue a search warrant for the house. *See Corral-Corral*, 899 F.2d at 930.

The stop of Mr. Li's van on February 21 was unrelated to the earlier search of 7565 121st Place. The questions of whether officers had reasonable suspicion to stop Mr. Li's van, probable cause to search his vehicle and probable cause to detain him are answered in the affirmative. The motion as it relates to the language the interpreter spoke to Mr. Li and whether he could understand that language, are determinative of the Miranda issue and, as such, that part of the

motion was confessed by the Government. While Mr. Li's consent to search his residence may not have been voluntary, officers searched this residence pursuant to a valid warrant based on information unrelated to Mr. Li's statement or his consent. The motion is denied.

IV.    Defendant's Motion to Suppress Intercepted Wire Communications (Doc. #31)

      Defendant Xiu Yun Li moves to suppress intercepted wire and electronic communications, and any evidence derived from these communications, on the ground that the affidavits submitted in support of the two wiretap applications at issue, approved by Judge Babcock, did not establish that the wiretaps were necessary. In particular, he argues that the affidavits submitted by Drug Enforcement Agency (DEA) Special Agent Michael Marshall demonstrated that traditional investigative techniques were working well and that his allegations attempting to justify the need for a wiretap were too conclusory to carry the government's burden of demonstrating necessity. The parties agreed at the evidentiary hearing on July 3, 2008 that I should decide this motion on the briefs and an examination of the affidavits.

    A.    Background

      Special Agent Marshall submitted two affidavits in support of wiretap applications to the Honorable Lewis T. Babcock, the first on January 24, 2008 ("January 24 affidavit") and the second on February 12, 2008 ("February 12 affidavit"). Both listed the defendant as a potential interceptee. These affidavits provide the following information concerning the subject investigation and the need for the wiretaps:

      1.    Overview of the Investigation

      Before the government's applications for wiretap interception, the DEA and the North Metro Task Force had made substantial progress in investigating the "Tang organization," whose

leader is Dan Tang. The organization allegedly consists of a number of individuals of Asian decent who purchase homes in the Thornton, Colorado area, convert these homes into marijuana grow houses, cultivate and distribute their crop and provide Tang with thirty percent of their profits. (Marshall Aff. 1-2, Jan. 24, 2008.) The Tang organization allegedly owns approximately 70 houses in the Thornton area and twenty-one of which were active grow operations. (Marshall Aff. 2, Jan. 24, 2008; Marshall Aff. 2, Feb. 12, 2008.)

The government obtained most of its information about the Tang organization through a confidential informant (CS1), who had extensive contact with Shen Huang, a "trusted associate" of Tang's and the target of the first wiretap (Marshall Aff. 1, 27-42, Jan. 24, 2008.) CS1 gave the agents an outline of the major players and cultivation methods of the organization. (Marshall Aff. 22-23.) CS1 provided the government with several grow house locations, details of how the organization chooses houses, equips them and conceals their locations, and even a video recording of organization members outfitting a new house for a grow operation. (Marshall Aff. 28-32, 35-26.)

CS1's information and surveillance led to two seizures and arrests. On October 9, 2007, after surveillance of a known grow house owned by Huang and associate Tran Van, Agents arrested Andrew Pettenger and seized 18 pounds of marijuana. (Marshall Aff. 27-28, Jan. 24, 2008.) On November 9, 2007, after a tip from CS1, agents arrested Paul Cho and seized 11 pounds of marijuana. (Marshall Aff. 32.) After his arrest, Cho implicated Tran Van and Huang as his suppliers, however Cho was not a viable confidential informant (Marshall Aff. 33.) Later North Metro Task Force Detective Gabe Oser also conducted a controlled buy of three ounces of

marijuana from Van with the help of a second confidential informant, CS2. (Marshall Aff. 30, Feb. 12, 2008.)

Agents also twice intercepted large amounts of cash linked to the Tang organization. In July of 2002, DEA agents seized $51,637 in currency taped to the ankles of Thanh Lang Tien at Denver International Airport. (Marshall Aff. 24, Jan. 24, 2008.) Tien told agents he received the cash from individuals who CS1 later linked to the organization. (Marshall Aff. 25, January 24, 2008.) In January of 2008 DEA Agents at Los Angeles International Airport stopped three individuals associated with the organization on route from Denver, and seized approximately $74,000 from their persons. (Marshall Aff. 11, Feb. 12, 2008.)

Notwithstanding these successes, the investigation had still not met all of its objectives when it applied for the first wiretap. Despite learning the identities of several organization members, the full extent of the organization was still unknown. Agents had learned the locations of at least seven suspected active grow houses, but this constituted only about a third of the organizations' estimated full grow activities. (Marshall Aff. 6-11, 2, Jan. 24, 2008.) Although CS1 had identified two organization-owned restaurants as fronts for money laundering, little else had been learned about the financial details of the organization. (Marshall Aff. 7, 10, Jan. 24, 2008.) Finally, although CS1's contacts with Huang and others produced significant information about how the organization cultivated marijuana, it produced relatively little information about how that marijuana was distributed and trafficked.

Much of this information was still unknown when the government submitted a second application for wiretaps on three more phones. The full membership of the organization was still unknown despite the addition of three more potential interceptees. (Marshall Aff. 14, 35, Feb.

28

12, 2008.) Two more active grow houses were identified, but agents still did not know the locations of more than half of the suspected grow houses. (Marshall Aff. 10, 14.) Further, little more had been learned about the financial aspects of the operation, beyond the minimal information gained from the seizure of funds at the Los Angeles Airport, discussed above. Finally the initial wiretap produced calls involving an unknown male, suspected to be a "trusted associate" of Tang's, but who was unknown to CS1, and whom the agents hoped to identify through the tapping of his phone. (Marshall Aff. 1.)

        2.       Statement of Necessity in the January 24 Affidavit

The January 24 affidavit sought to intercept Target Telephone #1, used by Shen Huang. (Marshall Aff. 2, Jan. 24, 2008.) This affidavit addressed eight traditional law enforcement techniques the agents had either used with limited success or believed were unlikely to be fruitful: (1) Physical Surveillance; (2) Confidential Informants; (3) Undercover Agents; (4) Interviews; (5) Search Warrants; (6) Grand Jury Subpoenas; (7) Collection of Refuse from Target Residences; (8) Telephone Toll Records, Pen Registers and Trap/Trace.

Marshall explained in the affidavit that physical surveillance had failed in a number of instances. Although surveillance of Huang's residence resulted in the seizure of marijuana and arrest of Pettenger, this arrest did not reveal deeper information about the organization or even Pettenger's direct supplier. (Marshall Aff. 44, Jan. 24, 2008.) Agents attempted to follow Huang unsuccessfully, and encountered dangerous evasive techniques while attempting to follow Paul Cho. (Marshall Aff. 44-45.) Finally Marshall indicated that based on CS1's statements about Huang and the organization's practices, surveillance may alert the targets to the investigation and lead to a change of tactics, compromising its goals. (Marshall Aff. 46.)

The January 24 affidavit also explained that although CS1 was extremely useful, he could not infiltrate the higher levels of the organization. (Marshall Aff. 47.) Huang was reluctant to let CS1 into this inner circle due to CS1's refusal to start his or her own grow house. (Marshall Aff. 47-48.) Marshall also stated that an undercover agent, even of Asian descent, would be unable to penetrate the higher levels of the organization because it is comprised of "family members," and CS1 was only permitted limited access out of a long-standing personal relationship with Huang. (Marshall Aff. 49.)

Interviews with witnesses or co-conspirators were also unfruitful. The interview of Paul Cho provided only limited information about his direct supply, Tran Van. (Marshall Aff. 51.) Cho also told Tran Van about his arrest, indicating that future interviews might compromise the investigation. (Marshall Aff. 52.) Marshall also explained that the earlier search of a "load vehicle" suspected to be associated with the organization revealed no deeper information about the organization or the driver's link to it. (Marshall Aff. 53.) Marshall made general statements about drug organizations' tendency to change tactics once locations or vehicles are compromised and expressed a fear that the execution of search warrants on the limited locations known to the agents would end the investigation. (Marshall Aff. 53.) Similarly, Marshall explained that the use of grand jury subpoenas was unlikely to be fruitful, thought it was not tried, because any individual with sufficient information of the organization's inner circle would have been reluctant to cooperate, and would not have been a good candidate for immunity. (Marshall Aff. 55.)

Marshall explained in the affidavit that agents did not try collecting refuse from Huang's house because he believed refuse would be of little use given the organization's constant use of

aliases or the names of uninvolved family members to obtain cell phones, cars and houses. (Marshall Aff. 56-57.) CS1 also reported that Huang and others transported their trash to dump sites away from their residences and that Huang always used cash instead of credit cards, even for $50,000 purchases, practices that make trash unlikely to be revealing. (Marshall Aff. 57.) As to the use of telephone toll records, pen registers and trap and trace devices, Marshall indicated that although these methods identified the phone numbers used by Huang's associates and confirmed reports made by CS1, they could not reveal the content of conversations or the identities of those using particular numbers. (Marshall Aff. 58-59.)

3.        Statement of Necessity in the February 12 Affidavit

The February 12 affidavit included the same eight techniques, mostly by reference to the January 24 affidavit. (Marshall Aff. 27-47, Feb. 12, 2008.) Marshall discussed new evidence obtained both by traditional techniques and by the wiretap of Target Telephone #1. The February 12 affidavit supported an application to intercept Target Telephones #2, #3 and #4, phones CS1 reported were used by Shen Huang, Yue De Deng, and an Unknown Male respectively, all suspected members of the Tang organization. (Marshall Aff. 2.) Marshall stated in the February 12 affidavit that he cannot "specifically address[]" the unknown male in the alternative investigative techniques section because his identity is unknown to CS1 and the wiretap would "assist in identifying the unknown male." (Marshall Aff. 27.)

Marshall described how continued physical surveillance met with "mixed success." (Marshall Aff. 28.) Surveillance of Shong Li, a suspected associate, caused Li to purchase a new car and advise others that he was being watched. (Marshall Aff. 28.) Marshall also explained his fear that the stop of individuals carrying cash at the Los Angeles Airport would result in a

changing of phone numbers and vehicles throughout the organization, although he does not indicate that this in fact occurred. (Marshall Aff. 28-29.) Marshall also noted: "surveillance has been absolutely unable to locate all the residences for Huang and Yue De Deng." (Marshall Aff. 39.)

Marshall also noted in the February 12 affidavit that CS1 had contact with Yue De Deng, and Huang but that Deng and Huang were reluctant to let CS1 in on "the inner workings of the organization." (Marshall Aff. 31, 33.) Marshall mentioned that a second informant, CS2, used only to introduce Broomfield Detective Oser to Tran Van for a controlled buy, and who Marshall stated is not able to further infiltrate the organization and is not a DEA cooperating source. (Marshall Aff. 30.)

The February 12 affidavit added to the January 24 affidavit's statements about the likely failure of grand jury subpoenas by noting that the investigation provided no "weak links" likely to cooperate. (Marshall Aff. 37.) Marshall also elaborated his belief that subpoenas were unlikely to be fruitful based on his experience and "conversations with Assistant United States Attorneys," who have tried similar cases. (Marshall Aff. 38.)

B. Legal Standard

In order to obtain a federal investigatory wiretap, the government must submit a written application to a federal judge that, among other things, "includes a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). The purpose of this so-called "necessity requirement" is "to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would

suffice to expose the crime." *United States v. Verdin-Garcia*, 516 F.3d 884, 889-90 (10th Cir.

2008). Traditional investigative techniques generally include: (1) standard visual and aural

surveillance; (2) questioning and interrogation of witnesses or participants (including the use of

grand juries and the grant of immunity if necessary); (3) the use of search warrants; and

(4) infiltration or undercover work; and (5) the use of pen registers and trap-and-trace devices.

*See, e.g.*, *id.* at 890; *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.2 (10th Cir.

2002).

The necessity standard does not require that all of these possible techniques have been

exhausted, but does require that the wiretap application include a "particularized discussion of

how normal investigative techniques were used, or why they were not used, against the target,"

and cannot rely on "wholly conclusory language." *United States v. Ramirez*, 479 F.3d 1229,

1240-41 (10th Cir. 2007). The necessity requirement is not to be treated hypertechnically, and

the government is expected to act in a common sense fashion. *Verdin-Garcia*, 516 F.3d at 890.

The government's burden of showing necessity is "met if the government demonstrates either

that normal investigatory techniques have been tried and failed or that they reasonably appear to

be unlikely to succeed if tried, or to be too dangerous to try." *Id.* (internal quotations omitted).

"The overall burden on the government is not great." *Id.* (internal quotation omitted).

Once a wiretap has been authorized by a judge, it is presumed valid and the defendant

bears the burden of overcoming this presumption. *United States v. Mitchell*, 274 F.3d 1307,

1310 (10th Cir. 2001). A district court reviewing another district court's issuance of a wiretap

order examines *de novo* whether the government submitted a full and complete statement of

necessity as required, and then reviews for abuse of discretion the district court's conclusion that

the wiretap was necessary.[2]  *United States v. Merton*, 274 F. Supp.2d 1156, 1167 (D. Colo. 2003); *see Ramirez-Encarnacion*, 291 F.3d at 1222 & n.1.

Examples of how this standard has been applied by the Tenth Circuit include *United States v. Ramirez*, 479 F.3d 1229 (10th Cir. 2007), and *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997).  In *Ramirez*, the Tenth Circuit held that the government adequately demonstrated the necessity of a wiretap in a prolonged investigation of a drug trafficking organization.  *Ramirez*, 479 F.3d at 1234, 1242.  The court found that the affidavit in support adequately described the failure of a number of traditional techniques.  *Id.* at 1242.  Audio or visual surveillance of the defendant and his Auto Repair Shop had failed to distinguish between "legitimate customers of Mr. Ramirez's business and those associates engaged in drug trafficking."  *Id.*  Although the investigation used an informant with a close relationship to Mr. Ramirez, he was unable to provide "detailed" information about the entire organization, and no other sources had sufficient contacts to be useful.  *Id.*  An undercover agent was also unlikely to do better than the well-connected informant.  *Id.*  Grand jury subpoenas were also likely to fail because they had failed in similar cases, the "possible witnesses [we]re conspirators themselves," and the affiant had a reasonable belief that "police questioning could compromise" the investigation.  *Id.*  The affidavit also indicated that such questioning could be dangerous in light of the informant's report that Ramirez had considered killing an associate for speaking to police. *Id.*  Finally, the affiant explained that pen registers could not "identify actual participants in the phone calls."  *Id.*  The court held that the affidavit described each technique used and its failure

---

[2]      For additional discussion regarding this standard of review, please see the discussion below regarding the defendant's request for an evidentiary hearing.

"not with broad generalities but with particularity to the ongoing investigation" of the target, and therefore made an adequate showing of necessity to justify the district court's grant of the application. *Id.*

By contrast, in *Castillo-Garcia*, the Tenth Circuit held that one of five applications for wiretaps in an investigation of a cocaine distribution had inadequately particularized showing of necessity and another was adequately particularized as to only one of its targets. *Castillo-Garcia*, 117 F.3d at 1182, 1196. Targets are distinguished from potential interceptees, as targets are the suspected primary users of the intercepted phone numbers. *Id.* at 1196. The court found that "nothing in [the application's] language [was] in any way particularized to" one of the targets, as for instance its description of physical surveillance "relie[d] on wholly conclusory language which would apply to every member of every suspected drug conspiracy." *Id.* at 1194. Therefore the court held that the two applications authorizing wiretaps against this particular target were inadequate and the information derived from the interception of that target telephone was properly suppressed. *Id.* at 1196.

C.      Analysis

1.      Necessity Determination

Defendant Li argues that the two affidavits submitted by Special Agent Marshall in support of applications for orders permitting wiretaps of phones allegedly used by members of the Dan Tang marijuana production and trafficking organization failed to demonstrate the necessity of the wiretaps, and (by implication) that Judge Babcock abused his discretion in

finding otherwise.[3]  Defendant argues that the wiretaps were unnecessary because the investigation utilizing traditional techniques was fruitful, and because the affidavits use generalized language to speculate that traditional investigative methods would not succeed. (Def.'s Mot. to Suppress, 4-6, June 2, 2008.)

With respect to the first point, the defendant overstates the results achieved through traditional investigative techniques.  As explained in the affidavits, although these techniques were often successful in revealing individual criminal acts, they nonetheless failed to reveal the full scope of the Tang operation and its participants.  This failure is analogous to the failures in *Ramirez*, where the informant's close contact with Ramirez nonetheless failed to produce detailed knowledge of the entire distribution organization, making the wiretap necessary. *See Ramirez*, 479 F.3d at 1242.  Further, the affidavits in this case make specific statements about the limited success of a number of investigative techniques including physical surveillance, confidential informants, undercover agents, search warrants, custodial interviews and pen registers.  *See id.*  The affidavits also explain with particularity the likely failure of those techniques not used, including grand jury subpoenas and trash collection.  *See id.*  Although the discussion of grand jury subpoenas includes several general statements that might apply to many

---

[3]It is perhaps best to define the meaning of abuse of discretion.  It is a term of art.  As I stated in *Bueno v. U. S. Bankruptcy Court*, 248 B.R. 581 (D.Colo. 2000) "An abuse of discretion is one that is grossly unsound, unreasonable, or illegal.  Discretion invested in judges results in a decision based upon what is fair in the circumstances and guided by the rules and principles of law.  It is the court's power to act, rightfully exercised, when a litigant is not entitled to demand the act as a matter of right.  An abuse of discretion occurs when a judicial determination is arbitrary, capricious or whimsical.  It is not merely an error of law or judgment, but an overriding of the law by the exercise of manifestly unreasonable judgment or the result of partiality, prejudice, bias or ill-will as shown by the evidence or the record of proceedings." Abuse of discretion is not a shibboleth to be shouted whenever a litigant or other court disagrees with the reasons given by a judge for his decision.

drug organizations, this section is quite similar to the discussion accepted by the court in the same section in the *Ramirez* affidavit, *see id.*, and the affiant here appears to have had a reasonable belief this tactic would fail based on prior experiences in similar cases.

The only potential issue I could discern with respect to the necessity discussion in the affidavits is that the second affidavit does not recite any specific techniques attempted to investigate an unidentified individual named as the user of Target Telephone #4. This omission might be considered problematic under the standard set forth in *Ramirez* and *Castillo-Garcia*, which requires that the affiant make statements specific to the individual targets. Mr. Li, who makes only a general claim that the investigation was going well enough without the wiretap, and that the wiretap affidavits were "boilerplate," did not raise this specific issue, however. (Def.'s Mot. to Suppress 6.) In addition, the omission of specific information regarding investigation of the user of Target Telephone #4 is completely understandable given the practical limitations of investigating an unidentified individual. Given the Tenth Circuit's admonition that the necessity requirement is not to be treated hypertechnically, the affidavit's treatment of the unidentified user of this telephone is sufficient.

Reviewing the completeness of the affidavits' statements of necessity *de novo*, I find that the affiant provided a full and complete statement of necessity in both affidavits. Given the affiant's extensive discussion of the traditional techniques attempted in the case and of the failure of the investigation to meet all of its goals, I find the Honorable Judge Babcock did not abuse his discretion by finding necessity and authorizing the wiretaps.

2.        Request for Evidentiary Hearing

Defendant first requested the opportunity to present testimony on the issues raised by his motion at the hearing on all pending motions, however he abandoned that request.

Before *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002) all or some of the judges in this district routinely held evidentiary hearings on wiretap authorizations. *See United States v. Oregon-Cortez*, 244 F. Supp.2d 1167, 1169-70 & n.1 (D.Colo. 2003); *United States v. Mack*, 272 F. Supp.2d 1174, 1177 (D.Colo. 2003). These hearings reportedly included brief direct examination and then lengthy cross-examination of the wiretap affiant relating to the necessity requirement. *See Oregon-Cortez*, 244 F. Supp.2d at 1170; *Mack*, 272 F. Supp.2d at 1177.

This practice was challenged by the government in *Oregon-Cortez* based on the standard for review for facial challenges to a wiretap declared by the Tenth Circuit in *Ramirez-Encarancion*: *de novo* regarding whether a full and complete statement regarding necessity was submitted by the government, and abuse of discretion regarding the "conclusion that the wiretaps were necessary in each situation." 291 F.3d at 122 n.1. The defendant in *Oregon-Cortez* argued that this standard only applied at the appellate level, and thus did not bar the district court from conducting an entirely *de novo* review, including an evidentiary hearing to develop information that was not before the judge that issued the wiretap. Judge Daniel rejected this argument, stating that it "defied logic" for the Tenth Circuit to apply one standard for review of the issuing judge's decision, while the district court applied another. *Oregon-Cortez*, 244 F. Supp.2d at 1172. As a result, Judge Daniel held, a district court, like the appellate court, should confine its analysis of a challenge to the facial validity of wiretap authorizations to the information

before the issuing judge. *Id.* at 1172. Thus, an evidentiary hearing is not only not required, it is not permitted. *See id.* At least two judges from this court, Judges Babcock and Sparr, also adopted the *Ramirez-Encarnacion* standard for review of facial challenges to wiretap authorizations such as this, *see United States v. Zapata-Hernandez*, 2006 WL 954838 (D. Colo. Apr. 11, 2006) (Babcock, J.); *United States v. Mack*, 272 F. Supp.2d 1174, 1177 (D. Colo. 2003) (Sparr, J.), and presumably the bar on evidentiary hearings as well.

Even under *Oregon-Cortez* and *Ramirez-Encarnacion*, an evidentiary hearing is required, pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978), if a defendant makes "a substantial preliminary showing that the affiant included a false statement in the wiretap affidavit, either knowingly or intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause or necessity." *Merton*, 274 F. Supp.2d at 1166 (internal quotation omitted). A hearing on such a "subfacial challenge" to a wiretap authorization may also be required for a material omission in a wiretap affidavit if the same requisite showing is made. *See id.* The defendant here has not alleged or made any showing that either of the challenged affidavits contain knowing or recklessly made false statements or material omissions. In view of the defendant's withdrawal of his request for an evidentiary hearing on the issues raised by this motion, it is not necessary for me to decide this issue.

The motion is denied.

Dated this 9th day of July, 2008.

s/John L. Kane
SENIOR U.S. DISTRICT JUDGE